U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED  1-23-2019
WILLIAM W. BLEVINS
CLERK


UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 15-197** |
| v. | * | **SECTION: "H"** |
| **CURTIS DANTIN** | * | |

\*   \*   \*

## FACTUAL BASIS

The United States, represented by the United States Attorney's Office for the Eastern District of Louisiana and the Environmental Crimes Section of the Department of Justice, and the defendant, **CURTIS DANTIN ("DANTIN")**, hereby agree that this Factual Basis is a true and accurate statement of the defendant's criminal conduct, that it provides a sufficient basis for **DANTIN**'s plea of guilty to Count 4 of the Third Superseding Indictment in the above-captioned matter, and had this matter proceeded to trial, the following facts would be established beyond a reasonable doubt through competent evidence and testimony:

From July 1, 2010, until October 13, 2013, Black Elk Energy Offshore Operations LLC. ("BEE"), a privately held limited liability company, owned and operated an oil production facility erected on a federal mineral lease, OCS-00367, in the Gulf of Mexico, approximately eight nautical miles from the shoreline of Louisiana, at an area designated as West Delta 32, in the territorial jurisdiction of the Eastern District of Louisiana. BEE's production facility at West Delta 32 consisted of three bridged platforms, "A," "D," and "E." The facility was operated by a crew employed by WOOD GROUP PSN, INC. ("WOOD GROUP") consisting of a lead operator, also known as a Person-In-Charge ("PIC"), two "A" operators, a "C" operator, and a

Roustabout. The PIC was responsible for the oversight and safety of the production facility. The PIC at the time relevant to this Factual Basis was CHRIS SRUBAR.

On or about September 1, 2012, oil production at West Delta 32 was shut-in, meaning that the oil was not flowing out of the wells at the facility, due to damage in the pipelines that transported BEE's oil. From that date, until on or about November 16, 2012, the facility at West Delta 32 underwent repairs. BEE initiated construction projects that included replacing the floatcell (also known as the WEMCO), upgrades to the free water knockout separator area, replacing valves on the manifold of the production header, and installing a divert valve on the Lease Automatic Custody Transfer ("LACT") unit and tying it into the sump line piping.

The LACT system was the last point in the production process prior to the oil leaving West Delta 32 and entering the sales transmission pipeline. The LACT system consisted of two pumps that took suction from one of two 400 barrel Dry Oil Tanks on the "E" platform. The pumps discharged through the basic sediment and water ("BS&W") monitor and then through the oil pipeline pumps to the sales pipeline. BEE planned to have the system modified to include a divert valve. The divert valve would redirect flow to the Wet Oil Tank when the BS&W monitor indicated unacceptable contaminants in the crude oil, keeping it out of the pipeline for sale until it was processed to an acceptable quality.

In October 2012, BEE contracted with an engineering firm to design plans for the floatcell replacement. BEE hired DON MOSS to be physically present at the West Delta 32 facility to inspect and coordinate the construction projects and to monitor worker safety. MOSS also accounted for expenditures for the projects and coordinated the arrival and departure of work boats that ferried supplies to the platform.

The construction projects that MOSS was hired to coordinate and inspect were to be physically completed by crews from defendant Grand Isle Shipyard, L.L.C. (f/k/a Grand Isle Shipyard, Inc.), a Louisiana limited liability company ("GIS"). Beginning at a time unknown, but prior to November 3, 2012, BEE contracted with GIS and requested a multiple man construction crew. GIS and BEE had forged a Business Alliance Agreement prior to this time wherein GIS was a preferred contractor for BEE. GIS employed defendant **DANTIN**, a construction superintendent, to be physically present on West Delta 32, managing the construction project and workers. GIS staffed the job with its own employees and employees from a third-party sub-contractor. The employees of GIS's subcontractor were all from the Philippines. WOOD GROUP's operators supported the construction efforts, including conducting crane operations and issuing necessary hot work permits.

The construction projects on West Delta 32 required hot work. Hot work is welding, grinding, and/or any other activity that may produce a spark. Hot work on an oil production facility is a hazardous activity capable of causing injury or death if done without due care and adherence to safety procedures and regulations.

In November of 2012, BEE's company policies mirrored Title 30 of the Code of the Federal Regulations, Section 250.113(c)(1)(i), and required that written permission, commonly referred to as a "hot work permit," be issued before any hot work began. Those involved in welding and the PIC were required to (1) conduct a pre-work inspection of the areas where welding or associated hot work was to be performed, (2) ensure that the area below and around the area where the work was to be performed was free from fire and explosion hazards with any equipment containing hydrocarbons or other flammable substances moved from within 35 feet of welding areas, and (3) ensure that a firewatch with gas detection equipment had been assigned.

3

If equipment containing flammable substances could not be moved, it had to be flame proofed or the contents rendered inert.

An individual hot work permit was not valid indefinitely. At a maximum, a hot work permit was valid for 12 hours. Once a hot work permit expired, all the precautionary steps, including a pre-work inspection, should have been completed again before a new hot work permit was issued. Welding on piping that had contained hydrocarbons was prohibited unless the piping was first rendered inert and the PIC determined that it was safe to weld.

Months before the explosion, BEE had attempted to perform the LACT upgrade, but had to postpone the work. At that time, BEE decided to eliminate field welding needed for the project by sending the piping to GIS to have all the welding done onshore and to build additional spool pieces so that the piping needed to connect the LACT divert valve to the sump line piping could be bolted in place.

MOSS knew that BEE hoped to be able to resume production on the platform soon after November 16, 2012. BEE would save money if the LACT upgrade could be completely finished before production resumed, and the upgrade would not have to be performed at a later date when oil was flowing from the wells. Prior to November 11, 2012, GIS crews worked on the WEMCO and separator which had been cleaned by a professional cleaning company because both items were going to be physically removed from the platform. This was the first job that GIS crews undertook. This was not in the vicinity of the LACT unit or the sump line piping. The WEMCO and Separator had been properly locked out/tagged out, and were safe for hot work.

Even with the facility shut-in, the sump line piping, which would be considered process piping, had to be isolated from the Wet Oil Tank and any contents of the piping rendered inert

before welding occurred. MOSS and **DANTIN** knew that the welding of the sump line piping would be required to complete the LACT unit upgrade. Prior to the construction crew performing any hot work on the piping, MOSS and **DANTIN** were required to get authorization and verification from SRUBAR that the piping was safe. This would require a pre-work inspection with SRUBAR and the welders, the designation of a firewatch with a gas detector, and a hot work permit specifically authorizing hot work for the LACT unit or sump line piping.

On the evening of November 15, 2012, MOSS and **DANTIN** knew that GIS crews were bolting in the divert valve for the LACT unit upgrade, which did not require hot work, but MOSS and **DANTIN** knew that the crews were going to work in the area again the next day and welding would be required to connect the divert valve piping to the sump line piping.

After **DANTIN** led a 6:00 a.m. safety meeting with the GIS workers on November 16, 2012, he instructed some of GIS's subcontracted construction workers to begin the welding of the sump line piping for the LACT unit upgrade, while others finished projects elsewhere. MOSS only briefly attended the safety meeting that morning, and SRUBAR did not attend at all. The "C" operator, who was SRUBAR's designee for issuance of hot work permits and who had been instructed to rotely copy permits from the prior day, was present in the galley, eating breakfast, at the same time GIS was there conducting its 6:00 a.m. safety meeting.

After the morning meeting was concluded, at approximately 7:00 a.m., the "C" operator provided to **DANTIN,** or a member of the crew, a hot work permit, dated November 16, 2012, for work to begin at 7:00 a.m., on terms and conditions stated therein. **DANTIN** did not check the area of the LACT unit or sump line piping after he received the permit from the "C" operator, and prior to the time that the hot work or welding commenced, to ensure that the piping had been

5

blocked off with any physical barriers. **DANTIN** admits herein that this failure to inspect constituted negligence.

**DANTIN** was watching as the workers made cuts to the sump line piping leading to the Wet Oil Tank. The Wet Oil Tank was approximately 20 feet from the welding area on the sump line piping. After the workers made the cuts to the sump line piping, liquid spilled from the piping. **DANTIN** and the workers decided that the liquid was water. **DANTIN** then left the area and returned to the office, on an adjacent platform, where MOSS and SRUBAR had offices. MOSS and SRUBAR both knew that the sump line piping, which previously contained hydrocarbons, had not been rendered inert and was not safe for welding.

After the cuts to the sump line piping, the construction workers began grinding on the piping, in preparation for welding. At approximately 9:00 a.m., the workers started to tack weld on the cut piping with an arc welder. The welding ignited the hydrocarbon vapors that had escaped from the Wet Oil Tank. The ignition of these vapors, which came straight from the sump piping that was connected to the Wet Oil Tank, caused a series of explosions in the three oil tanks on the platform. The Wet Oil Tank and one of the two Dry Oil Tanks were blown into the Gulf of Mexico. The other Dry Oil Tank was blown off its base and destroyed the platform crane that was positioned above it. Oil spilled into the Gulf of Mexico, causing a sheen on the water. Oil rained down on the lower deck of the platform, where workers below the LACT unit had been performing other construction activity.

**DANTIN** admits that he was negligent in his failure to inspect the LACT piping after being issued the permit, and prior to any hot work being performed, as described above. As a result of **DANTIN**'s negligence, and the negligence of others, oil entered the Gulf of Mexico in a quantity sufficient to cause a sheen.

<u>Limited Nature of Factual Basis</u>

This proffer of evidence is not intended to constitute a complete statement of all facts known by **DANTIN** or the government, but rather is a minimum statement of facts intended to prove the necessary factual predicate for the guilty plea. The limited purpose of this proffer is to demonstrate that there exists a sufficient legal basis for **DANTIN**'s plea of guilty to the offense in Count 4 of the Third Superseding Indictment, and to stipulate that all of **DANTIN**'s relevant acts took place within the Eastern District of Louisiana.

READ AND APPROVED:

_____    1/23/19
CURTIS DANTIN                Date
Defendant

_____    1/23/19
EDDIE CASTAING               Date
Attorney for Defendant

_____    1/23/19
NICHOLAS D. MOSES            Date
Assistant United States Attorney

Nicholas Moses for Emily Greenfield    1/23/19
EMILY K. GREENFIELD                    Date
Special Assistant United States Attorney

Nicholas Moses for Ken Nelson    1/23/19
KENNETH E. NELSON                Date
Senior Trial Counsel, ECS